HERMINIO MADERA, ETC., ET AL., Plaintiffs and Appellees, *v.* METROPOLITAN CONSTRUCTION CORPORATION ET AL., Defendants and Appellant the former, EULOGIO RIERA, Third-party Defendant. HERMINIO MADERA, ETC., and JOAQUINA RODRÍGUEZ EMA MADERA, Plaintiffs and Appellant the former, *v.* METROPOLITAN CONSTRUCTION CORPORATION, EULOGIO RIERA, and MARTA RODRÍGUEZ EMA RIERA, Defendants and Appellees. HERMINIO MADERA, ETC., ET AL., Plaintiffs and Appellees, *v.* METROPOLITAN CONSTRUCTION CORP., EULOGIO RIERA, and MARTA RODRÍGUEZ EMA RIERA, Defendants and Appellants the last two.

Nos. R-62-188, Decided December 29, 1967.
R-62-193,
R-62-195.

*V. M. Sánchez Fernández, Dubón & Dubón,* and *A. Torres Braschi* for Metropolitan Construction Corporation. *Sergio G. Gelpí* and *Oscar Castro Rivera* for Herminio Madera. *Félix Ochoteco, Jr.,* for Joaquina Rodríguez Madera. *Orlando J. Antonsanti* for Eulogio Riera.

Mr. Justice Blanco Lugo delivered the opinion of the Court.

On January 4, 1960, Herminio Madera and Eulogio Riera, without the presence of their respective wives, executed

a private deed of sale signed before a notary by virtue of which they sold to the Metropolitan Construction Corporation, a parcel of land which belonged to the conjugal partnerships which they had constituted with their wives.[1] Four months and a half later, on May 16, Mrs. Rodríguez Ema

---

[1] "SALE.—In the city of San Juan, Puerto Rico, on the fourth day of January of nineteen hundred and sixty.—APPEAR.—AS PART OF THE FIRST PARTY: Mr. Herminio Madera, of legal age, merchant, married to Joaquina Rodríguez Ema, and Mr. Eulogio Riera, of legal age, lawyer, married to Marta Rodríguez Ema, both residents of San Juan, P.R.—AS PART OF THE SECOND PARTY: The Metropolitan Construction Corporation, a corporation organized in accordance with the laws of the Commonwealth of Puerto Rico, and represented, in this case, by its President Jorge I. Rosso.—The parties state that they agreed to the purchase and sale of the property which is hereinafter described and which purchase takes place under the following clauses and conditions.

"FIRST:—That Herminio Madera and Eulogio Riera, together with their respective wives, are owners of the following property:

"PARCEL of land situated in the jurisdiction of Carolina, Puerto Rico, in the place known as Hato de Cangrejos Arriba, having an area of about three and a half cuerdas with the following boundaries: —on the North, the Atlantic Ocean; on the South, State Highway 57 which leads to Carolina; on the East, Arthur Henry Noble; and on the West, the Heirs of Rodríguez Ema.

"—This parcel of land is entered at folio 128 of volume 66 of Carolina, property No. 2967, first entry.

"—According to Madera and Riera this property is free of any encumbrance.

"—Herminio Madera and Eulogio Riera SELL by means of the present document and the Metropolitan Construction Corporation by representation of its President Jorge I. Rosso PURCHASES the above described property, subject to the following clauses and conditions:

"—(A) The selling price shall be the amount of FOUR HUNDRED THOUSAND DOLLARS ($400,000) of which the vendors receive in this act the sum of FIFTY THOUSAND DOLLARS ($50,000) and the balance of the deferred payment as soon as this act be made into a public deed.

"—(B) The parties also agree that in case the parcel of land formerly described would not have an area, after making the survey, of 12,854 meters, this sale shall be rescinded and become void.

"—The parties being informed of the contents of this document, they accept it wholly because it agrees with their wishes and instructions.

"—In testimony whereof it is signed in San Juan, Puerto Rico, January 4, 1960.

"(Signed) Eulogio Riera.—Eulogio. Riera.—Herminio Madera.—Herminio Madera.—Metropolitan Construction Corp. by Jorge I. Rosso:—

Madera brought an action for declaratory judgment to determine that in the absence of her express consent, the contract in question did not affect the dominion title which the conjugal partnership had over the joint interest which belonged to her in the aforementioned property.[2] The buyer corporation, the spouses Riera-Rodríguez Ema, and Mr. Madera appeared as defendants.[3] In filing its answer the Metropolitan filed a claim, which it entitled complaint against third party, against Madera and Riera,[4] in which it requested that the latter be ordered to pay the damages they were caused, by the representations made by them to the effect that they had authority from their respective wives to execute the sale.

Settling the conflict in the evidence—fundamentally in favor of the evidence proposed by the Metropolitan—the trial court established the following findings of fact:

"1. Eulogio Riera and Herminio Madera are co-owners, together with their respective wives, of a small parcel of land of approximately three and a half cuerdas in the jurisdiction of Carolina. During the last days of 1959, Madera and Riera placed, in a visible part of their parcel of land, a sign informing the public in general that the property was for sale. As a consequence thereof, an agent of the Metropolitan Con-

(signed) J. I. Rosso.—Aff. No. 2863.—Signed and acknowledged before me by Herminio Madera, Eulogio Riera, and Jorge I. Rosso, all of the personal circumstances formerly stated, and whom I personally know, in San Juan, P.R., January 4, 1960. (signed) Manuel Martín Maldonado.—Notary Public."

[2] The joint interest of the spouses Madera-Rodríguez Ema is 42.86%, and that of the spouses Riera-Rodríguez Ema is 57.41%. The parcel of land was valued at $24,500 for the purposes of the division of a community which existed in relation to a property of greater area.

[3] In the course of the suit, Mr. Madera requested that he be included as plaintiff as administrator of the conjugal partnership which he had constituted with the original plaintiff, "all without prejudicing the fact that she continue with [sic] said coplaintiff."

[4] Madera and Riera having been joined as codefendants, it was a case of a cross-claim against coparty. Rule 11.7 of the Rules of Civil Procedure.

struction Corporation became interested in acquiring the property, thus initiating a series of negotiations for the purpose of effecting the transaction.

"2. On December 30, 1959, the President of the defendant-corporation spoke with Herminio Madera during lunchtime. The latter informed him that the property was for sale at $30.00 the square meter. Jorge Rosso—who represented the defendant-corporation—accepted substantially the terms of the sale. On that occasion Riera notified Rosso that the parcel of land was for sale, but only on condition that a lump sum of $400,000 would be paid for it. The proposition was promptly accepted.

"3. Rosso notified the vendors that he could pay immediately the sum of $50,000 as advance payment, and the rest of the sum would be paid when the corresponding deeds were signed. At that moment Riera as well as Madera informed Rosso that they were married, and that the property belonged to the respective conjugal partnerships. However, both vendors notified Rosso at that moment that they had previously consulted the transaction with their respective wives, and that they had expressed their conformance with the sale. Because of Rosso's persistence that the agreement be final, a document was drafted which contained the terms of the transaction granted, which was signed by Riera, Madera, and Rosso before a Notary friend of Rosso who was in the latter's office. The wives of the vendors were not present in said act nor did they sign the document.

"4. The following night an agent of the defendant-corporation visited the residence of Herminio Madera and spoke with him and his wife. Mrs. Madera asked the agent of the corporation about the plans that the officials of the latter had in relation to the parcel of land. Mrs. Madera was, also, interested in knowing if the corporation planned to construct an apartment building in that property, so that she could acquire an apartment for her daughter. Approximately two weeks later Mrs. Madera casually ran into the agent of the defendant-corporation and asked him about the transaction granted, and the date the sum for the property would be paid.

"5. In the meantime, Eulogio Riera, who received from Rosso the check for $50,000 which the latter gave him in advance payment the night the transaction was effected, asked his wife to deposit that money in the bank account of a business she

directs. Mrs. Riera indorsed the check for $50,000, and deposited it in the aforesaid bank account.

"6. When the lawyers of the defendant-corporation began to take steps for the drafting of the deeds, they became aware of certain registration obstacles. For this reason, on various occasions Rosso and his lawyer met the vendors to smooth the way for clearing the title which was to be registered by the defendant-corporation. In the meantime, the value of the parcel of land rose vertiginously, to such an extreme that at the time of the trial the aforementioned property had a value of more than one million dollars for the defendant-corporation.

"7. Contemporaneously with the steps being taken by its lawyer, the defendant-corporation initiated steps to obtain the necessary financing for the construction works to be carried out in the parcel of land. The President of the corporation went to the State of Florida, and succeeded in convincing an investor to come to Puerto Rico to inspect the property. Later. Rosso went to Jamaica to effect identical steps. He took various steps before the Planning Board of Puerto Rico and before the Tourist Department to achieve his plans.

"8. Thus, on May 14, 1960, the officials of the defendant-corporation gave instructions to some workers to clean the area in issue. By request of Mrs. Madera the workers suspended their work because the latter told them that the property had not been sold. Two days later Mrs. Madera brought the present suit before the court and her husband as well as Riera and his wife were joined as defendants. She also sued the Metropolitan Construction Corporation. All the defendants, with the exception of the Metropolitan, consented to the suit right away. The corporation, however, brought a complaint against third-party alleging that it had been caused damages which should be compensated."

Making reference to the provisions which require the express consent of the wife for the alienation of community property, the trial judge concluded that the transaction never had any force at law, since Mrs. Madera and Mrs. Riera did not give their express consent for the sale of the parcel of land. He rendered judgment. accordingly, declaring the contract above-copied void and null, and also granted the cross-claim against coparty, and ordered Messrs. Madera

and Riera to pay the sum of $5,000 to the Metropolitan for damages. The corporation, the spouses Riera-Rodríguez Ema, and Mr. Madera, individually, appealed from the pronouncements of the judgment which were adverse to them.

The crucial question involved, in the light of the findings of fact of the trial court, does not seem to have been considered by the trial court in making its conclusions of law. Having under consideration certain assumptions of ratification of the contract by the plaintiff wife, the court merely pronounced the nullity thereof, without attributing any legal effect to the acts mentioned.[5] It states that the transaction was never valid and cites *Molina* v. *Registrar*, 61 P.R.R. 143 (1942); *Pérez* v. *Registrar*, 62 P.R.R. 760 (1944), and *Robles* v. *Guzmán*, 67 P.R.R. 671 (1947), which relevancy to the matter we are considering is remote. We cannot agree either, as the plaintiff-appellee suggests, that this conclusion of law involves a finding that the contract was not ratified. An examination of the allegations—especially of the so-called counterclaim and the Metropolitan's claim against third-party—demonstrates that the ratification was not invoked as part of the theory of the appellant-corporation, and after judgment was rendered no attempt was made—by means of a motion for reconsideration—in spite of the fact that the findings of fact themselves justified it, to have the court express itself on the legal effect of the alleged acts of ratification of Mrs. Madera.

▄▄▄ 1. Sections 91 and 1313 of the Civil Code, 31 L.P.R.A. §§ 284 and 3672, in acknowledging the authority of the husband as the administrator of the conjugal prop-

---

[5] The trial court goes further still: it declares the nullity as to the joint interest of the spouses Riera-Rodríguez Ema without the latter having requested it. Although it is indispensable to grant the adequate remedy, according to Rule 44.3 of the Rules of Civil Procedure, it should be in a manner compatible with what is alleged and proved. *González* v. *Heirs of Martín*, 83 P.R.R. 737, 741 (1961).

erty, provide that the real property belonging to the conjugal community may not be alienated or burdened, such a transaction being null, except when effected with the *mutual consent** of both parties to the marriage. This rule for controlling the patrimonial relations between the spouses is one of the few which does not have its precedent in the Spanish Civil Code,[6] perhaps the Commission for Codification of Laws being inspired by a different concept on the position of the woman in marriage. Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico, Libro Primero* 38 and 250–253. However, a contract executed without being subject to the performance of these provisions is ratifiable.[7]

---

* Editor's Note:

In the English version of 31 L.P.R.A. § 284, the phrase *consentimiento expreso* appears as "mutual consent," and in § 3672 the same phrase is translated as "express consent."

[6] In general terms, the Spanish legislation granted a limited intervention to the wife as to property, even her own. Section 60 of the Civil Code grants the husband the representation of his wife and § 61 requires the marriage license so that the wife may (1) acquire for valuable or lucrative consideration, (2) *alienate her property*, and (3) bind herself. Section 1413 formerly authorized the husband to alienate or encumber the property of the conjugal partnership, for valuable consideration without the consent of the wife. It is not until the approval of the Act of April 24, 1958, which amended the aforementioned § 1413, that the strictness is slackened by providing that the husband may bind, for a consideration, the real estate of the conjugal partnership; "but he needs the consent of the wife, or, in default thereof, judicial authorization by a well-founded request of the husband . . . for acts on the disposal of real estate or commercial establishments." The wife is also authorized to request the judge, with respect to other property to grant certain precautionary measures when the acts of disposal of the husband involve great risk for the conjugal partnership.

[7] In the states where the consent of the wife is required for the alienation or disposal of community property, it is admitted that the subsequent ratification of the wife, be it express or by acts and conduct—on occasions the doctrine of estoppel by conduct is referred to—hinders the attack thereof. *Whiting* v. *Johnson*, 390 P.2d 985, 988 (Wash. 1964); *McGillivray* v. *Nielson*, 192 P.2d 369, 370 (Wash. 1948); *In re Horse Heaven Irr. Dist.*, 141 P.2d 400 (Wash. 1943); *O'Connor* v. *Jackson*, 74 Pac. 372 (Wash. 1903); *McKay* v. *Darusmont*, 115 P.2d 221 (Cal. 1941); *Bush* v. *Rogers*, 109 P.2d 379 (Cal. 1941); *Rice* v. *McCarthy*, 239 Pac. 56 (Cal.

■ One of the most common assumptions of the ratification occurs when, as Sánchez Román indicates,[8] an act which lacks legal force is given such force, and that, therefore, it was not till then properly legal. The ratification purifies the act or contract of any vices it originally had so that it can produce all the legal effects which are attributable thereto; it is a waiver to invoke the cause of nullity which affects it. This ratification can be express or implied, and requires from the person who ratifies it a statement of consent to validate the contract, *Central Boca Chica, Inc.* v. *Treasurer of Puerto Rico*, 54 P.R.R. 404 (1939).[9]

---

1925); see 10 Cal. Jur.2d, *Community Property*, § 78; Schwartz, *Gifts of Community Property: Need for Wife's Consent*, 11 U.C.L.A. L. Rev. 26 (1963); and see also, Knutson, *California Community Property Laws: A Plea for Legislative Study and Reform*, 39 So. Cal. L. Rev. 240 (1966).

. In the two cases which involve the release by one of the spouses of the limitation imposed on the dispositive authority of the other, to which we referred in footnote 5, the Spanish doctrine and jurisprudence admit that contracts executed without a marriage license can be ratified, Judgments of March 22, 1965 (49 *Revista Derecho Privado* 517), April 24, 1951 (34 *Jur. Civ.* 818, II), March 6, 1945 (10 *Jur. Civ.* 83, II), May 24, 1928 (183 *Jur. Civ.* 906), or without the uxorial consent required by the Act of April 24, 1958, which amends § 1413, Judgment of March 13, 1964 (48 *Revista de Derecho Privado* 545). As to this last one, Federico de Castro states in his book *Compendio de Derecho Civil* (3d ed., 1966) tome I, vol. II-1, p. 280, that the consent to which § 1413 of the Spanish Civil Code refers "can be express or implied (*facta concludentia*) and supplied by ratification (§ 1259)"; and Bonet Ramón in *Código Civil Comentado* 1097 (Aguilar ed., 1962), says that "The 'uxoris' consent as every statement of consent which has no fixed form prescribed, can be express or implied, and may be given before the transaction of disposal takes place, simultaneously with the execution of said transaction, or subsequent thereto." See also, "*En torno al artículo 1413 del Código Civil y cuestiones con él relacionadas*", 37 *Revista Crítica de Derecho Inmobiliario* 187 (1964), and "*Protección del interés de la mujer en el patrimonio ganancial*," 12 *Anuario de Derecho Civil* 481 (1959).

[8] 2 *Derecho Civil* 554 (1911 ed.).

[9] The ratification and confirmation present common characteristics and the same effect, but in strict law, the former consists in assuming the obligations which stem from a contract executed, not by the interested person personally, but by another person who had no representation or went beyond the authority granted him; the latter consists of giving

With respect to the disposal of the real property of the conjugal partnership, in *Caballero et al.* v. *Pomales et al.*, 17 P.R.R. 691 (1911), we stated that the wife could ratify a contract of sale—in which execution only the husband appeared, stating that he had the former's consent—by her subsequent appearance before a notary and acceptance that the contract had been ratified with her consent and knowledge. See also, *Cortijo* v. *Registrar of Property*, 21 P.R.R. 465 (1914). *Encarnación* v. *Salim*, 69 P.R.R. 715 (1949), acknowledges that the wife can ratify impliedly the alienation of community property, but we believe that, as we shall discuss later, the acts involved therein were not sufficient to be equal to the ratification of the actions of the husband.

 2. It being established that the alienation of real property by the husband without the consent of the wife is ratifiable by the latter, let us examine briefly the nature of "express" consent to which §§ 91 and 1313 of the Civil Code, *supra*, refer. It is first necessary to clarify that the requisite does not refer to the notarial or registration point of view, for it is known that to produce its effects in this ambit it is indispensable to establish the intervention of the wife in the corresponding public deed or by means of any other document which gives legitimate access to the Registry of Property. We are considering now simply the contractual point of view, governed by the spiritualist system which underlies our Civil Code. Express does not mean that it necessarily has to be in writing, for if that were the case it would have been easy to indicate that a written consent was necessary. *Cf.* § 172 of the Civil Code of California, 6 West's Annotated California Codes, p. 165. The scope of the provision can be

validity to a voidable act executed by the person interested personally. II-1 Puig Brutau, *Fundamentos de Derecho Civil* 332–333 (1954).

In relation to acts of ratification or confirmation, see *Méndez* v. *Registrar*, 68 P.R.R. 288 (1948); *Dooley* v. *Pantoja*, 61 P.R.R. 619 (1943); *Blanch* v. *Heirs of Del Moral*, 57 P.R.R. 23 (1940); *Ruiz* v. *Registrar*, 40 P.R.R. 896 (1930); *Ledesma et al.* v. *Agrait et al.*, 19 P.R.R. 541 (1913).

no other than that of an undoubted, unmistakable statement that the wife, having knowledge of the contract executed, affirms it. Referring to § 1043 of the Civil Code, 31 L.P.R.A. § 2993, which states that obligations arising from law are not presumed, and that those "expressly" determined in this Code or in special laws are the only demandable ones, we said in *Franco Oins et al. and Jones* v. *Caneja*, 26 P.R.R. 457, 463 (1918), that "By 'expressly' the code means *clearly, specifically, concretely, manifestly, . . . .*" The same criterion prevails in the present situation. Perhaps it is worth noting that since the rule responds to the desire of protecting the patrimony of the conjugal partnership, and especially the interests of the wife, a restrictive interpretation should be applied to the alleged acts of ratification, and that the mind of the judge should be fully convinced that they reveal in an authentic manner the required consent. In *Encarnación* v. *Salim, supra*, it was sought to establish the express consent by ratification, and we held that the statement of the wife upon referring to the contract made by her husband to the effect that "it is the same to me because it is for the education of my daughters," did not constitute the ratification of the husband's acts "in such a manner that a specific performance of the offer . . . might be enforced,"[10] evidently applying the restrictive opinion we have stated.

[10] "Regarding this point, the evidence for the plaintiff only makes reference to a conversation between her and Salim in the latter's house, during which Salim's wife was present. Said conversation, as told by the plaintiff herself, was as follows:

'Q. Where did Mr. Salim live?
A. At Estrella Street.
Q. Was Mr. Salim alone?
A. With his wife.
Q. Did you find him there?
A. Yes, sir.
Q. What happened in the interview?
A. We again discussed the matter and then he told me: "Well, I would sell but my wife objects." I answered: "I have entered into a contract with you and you offered it to me and I expect that you make a decision." He answered: "She does not want to sell." Then the lady

■ 3. Let us examine the facts of the present case in the light of the findings of fact of the trial court and of the documentary evidence presented. In the parcel of land to which the suit refers, which is adjacent to the lot on which the residence of the spouses Madera-Rodríguez Ema is located, two signs had been placed for the public which indicated that it was for sale (Exhs. 3 and 4 of the defendant Metropolitan Construction Co.), a fact which, in spite of the protests of Mrs. Madera, she could not ignore.[11] During the month of January of 1960 some employees of the defendant-corporation measured the parcel of land, a fact which was witnessed by Mrs. Madera. The night after the meeting which culminated in the signing of the contract, Mr. Pedro González Mena visited the residence of the Madera-Rodríguez Ema, and in the course of the conversation she asked about the purposes to which the buyer would devote the real property, because if it was going to construct an apartment building she was interested in acquiring one for one of her daughters. Two weeks later Mrs. Madera ran into the same agent of the corporation, and asked him about the transaction, "that she was waiting for it to be finished to go to Europe, to Spain." It was not till about four and a half months later that the suit for a declaratory judgment was filed, alleging that the plaintiff had knowledge of the transaction only two days before, a version which the court did not believe.

---

said: "It is the same to me because it is for the education of my daughters."

Q. Was she present?

A. Yes, sir.' "

[11] At a hearing held in connection with a request for a restraining order Mrs. Madera accepted that the parcel of land "had been for sale for a long time" (Tr. Ev. 42), and that her husband had informed her in December or January of 1960 that "he had a buyer for that property." (Tr. Ev. 67.)

These facts taken and weighed as a whole, lead us to the conclusion that Mrs. Madera had knowledge of the transaction from the beginning, she had knowledge of its terms, and she ratified it with her affirmative acts. We agreed that the mere course of time between the contract and the beginning of the suit would not be sufficient, since what the law requires is the affirmative act of agreement and not the disapproval. *Cf. La Urbana contra Villasor y Villanueva,* 59 J. Fil. 681 (1934). But this fact cannot be ignored where there exists, as in the present case, other circumstances which indicate an implied ratification. Here we have acts which reveal the will to accept the contract, and not merely a passive or hesitant consent. On the other hand it is not venturesome to state that the vendors made evident their desire to undo the transaction. To that effect, on April 21, 1960, they wrote a letter to the President of the Metropolitan Construction Co., in which they returned the amount of $50,000 which had been given as initial installment. In said letter it was said "It is needless to tell you that if the obstacles which now *preclude you* from buying the property would be overcome," referring to certain restrictions of use of the parcel of land. It is significant that this initiative corresponded to Mr. Rosso, and that the best denial that such was his wish is that what allegedly gives rise to the suit is the corporation's intention of installing a fence of concrete posts in front of the parcel of land. No reference was made then, either, to the lack of consent of Mrs. Madera, and it is only when Rosso refused to rescind the contract that judicial action was taken under pretext of lack of consent of one of the wives. As to Mrs. Riera it was not wise to include her as a plaintiff on the ground of lack of "express consent" since her action in receiving the check for $50,000, and depositing it in a private account of her business, constituted an even stronger and unmistakable ratification. *Rivera* v.

638

*Manufacturers Life Ins. Co.,* 34 P.R.R. 239 (1925) ; *Campbell* v. *Webber,* 188 P.2d 130 (Wash. 1947) ; *cf. Dooley* v. *Pantoja, supra.*

The conclusion we have reached, relieves us from considering the errors assigned in the petitions for review filed by spouses Riera-Rodríguez Ema and Mr. Madera.

The judgment rendered by the Superior Court, San Juan Part, on July 3, 1962, will be reversed, and in its place judgment will be entered establishing that the contract of January 4, 1960, is valid, because it was duly ratified, and that the obligations which arise therefrom are enforceable.

Mr. Chief Justice Negrón Fernández did not participate herein. Mr. Justice Belaval and Mr. Justice Santana Becerra dissented.